[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 28, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15141

_____

BRB No. 05-00947-BLA


THE PITTSBURG & MIDWAY COAL MINING CO.,


                                                            Petitioner,


versus


DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,


                                                            Respondents.


_____

Petition for Review of a Decision of the
Benefits Review Board

_____

**(November 28, 2007)**

Before MARCUS and PRYOR, Circuit Judges, and LAND,* District Judge.

_____

* Honorable Clay D. Land, United States District Judge for the Middle District of
Georgia, sitting by designation.

MARCUS, Circuit Judge:

The Pittsburg & Midway Coal Mining Company ("P & M") petitions for review of a decision of the Benefits Review Board affirming an administrative law judge's award of survivor's benefits under the Black Lung Benefits Act (the "BLBA" or the "Act"), 30 U.S.C. §§ 901-945. The central issue on appeal is whether the claimant, Dorothy Cornelius, established that her husband's death was "due to" pneumoconiosis as required by the Act. After thorough review, we conclude that substantial evidence supports the administrative law judge's conclusion that, under § 411(c)(3) of the Act and its implementing regulation, 20 C.F.R. § 718.304, Ms. Cornelius was entitled to an irrebuttable presumption that her husband's death was "due to" pneumoconiosis, and we therefore deny the petition for review.

**I.**

A.

An understanding of the relevant statutory and regulatory framework as well as the basic facts is essential to deciding this case. The Black Lung Benefits Act provides benefits "to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease. . . ." 30 U.S.C. § 901(a). The Act delegates to the Secretary of Labor ("Secretary") the task of prescribing standards for determining whether a miner's total disability

2

or death is "due to" pneumoconiosis, id. § 921(b), subject to several statutorily-created evidentiary presumptions. The most important of these presumptions is contained in § 411(c)(3) of the Act, which provides that "there shall be an irrebuttable presumption that [the miner] is totally disabled due to pneumoconiosis or that [the miner's] death was due to pneumoconiosis" if the

> miner is suffering or suffered from a chronic dust disease of the lung which (A) when diagnosed by chest roentgenogram, yields one or more large opacities (greater than one centimeter in diameter) and would be classified in category A, B, or C in the International Classification of Radiographs of the Pneumoconioses by the International Labor Organization, (B) when diagnosed by biopsy or autopsy, yields massive lesions in the lung, or (C) when diagnosis is made by other means, would be a condition which could reasonably be expected to yield results described in clause (A) or (B) if diagnosis had been made in the manner prescribed in clause (A) or (B) . . . .

30 U.S.C. § 921(c)(3).

The Secretary has, in turn, incorporated Section 411(c)(3)'s "irrebuttable presumption" into the black lung regulations at 20 C.F.R. § 718.304.[1] The

---

[1] 20 C.F.R. § 718.304 provides:

There is an irrebuttable presumption that a miner is totally disabled due to pneumoconiosis, that a miner's death was due to pneumoconiosis or that a miner was totally disabled due to pneumoconiosis at the time of death, if such miner is suffering or suffered from a chronic dust disease of the lung which:

(a) When diagnosed by chest X-ray (see § 718.202 concerning the standards for X-rays and the effect of interpretations of X-rays by physicians) yields one or more large opacities (greater than 1 centimeter in diameter) and would be classified in Category A, B, or C in:

(1) The ILO-U/C International Classification of Radiographs of the

Secretary has incorporated § 718.304 into 20 C.F.R. § 718.205(c), the general regulation establishing standards for determining whether a miner's death is "due to" pneumoconiosis.  Section 718.205(c) provides in pertinent part:

> [D]eath will be considered to be due to pneumoconiosis if any of the following criteria is met:
>
> (1) Where competent medical evidence establishes that pneumoconiosis was the cause of the miner's death, or
>
> (2) Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis, or
>
> (3) Where the presumption set forth at § 718.304 is applicable.
>
> (4) However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or the principal cause of death was a medical condition not related to pneumoconiosis, unless the

Pneumoconioses, 1971, or subsequent revisions thereto; or

(2) The International Classification of the Radiographs of the Pneumoconioses of the International Labour Office, Extended Classification (1968) (which may be referred to as the "ILO Classification (1968)"); or

(3) The Classification of the Pneumoconioses of the Union Internationale Contra Cancer/Cincinnati (1968) (which may be referred to as the "UICC/Cincinnati (1968) Classification"); or

(b) When diagnosed by biopsy or autopsy, yields massive lesions in the lung; or

(c) When diagnosed by means other than those specified in paragraphs (a) and (b) of this section, would be a condition which could reasonably be expected to yield the results described in paragraph (a) or (b) of this section had diagnosis been made as therein described: Provided, however, That any diagnosis made under this paragraph shall accord with acceptable medical procedures.

evidence establishes that pneumoconiosis was a substantially contributing cause of death.

B.

This case arises from the death of Clyde Cornelius, a retired coal miner. Mr. Cornelius worked in coal mines for approximately twenty-five years, ending in 1987. He died in 1999 at the age of 74. His death certificate listed congestive heart failure as the immediate cause of death and anemia as a contributing cause of death; pneumoconiosis was not mentioned.[2]

Following Mr. Cornelius's death, his widow, Dorothy Cornelius, filed a claim for survivor's benefits under the Act. After identifying P & M as the responsible employer, the Department of Labor ("DOL") adjudication officer issued a proposed decision and order finding that Ms. Cornelius was entitled to benefits under the Act. P & M contested the proposed decision and requested a formal hearing before an administrative law judge ("ALJ").

At the formal hearing conducted by the ALJ, Ms. Cornelius relied on the autopsy report and deposition testimony of Dr. Mary Louise Guerry-Force, the board-certified pathologist who performed an autopsy of Mr. Cornelius's lungs.

---

[2] Prior to his death, Mr. Cornelius sought benefits under the BLBA, claiming that he was totally disabled due to pneumoconiosis. The Department of Labor rejected his claim, and Mr. Cornelius did not pursue the matter any further. His claim is not before us.

According to the autopsy report, Dr. Guerry-Force's gross examination revealed the following:

> The pleural surfaces reveal moderate subpleural anthracotic type pigment deposition bilaterally. Multiple grey black subpleural nodules measuring from 0.1 up to 0.3 cm are noted throughout all of the lobes. In addition, the right upper lobe reveals multiple, irregular, gray black areas of induration measuring up to 1.2 cm.

(DX 11, Autopsy Report at 2).[3] The autopsy report also stated that on microscopic examination Dr. Guerry-Force found that

> [s]ections of the lungs demonstrate a focally thickened pleura with moderate subpleural anthracotic type pigment deposition. Multiple scattered fibroanthracotic nodules measuring up to 1.2 cm are seen. The nodular lesions consist of dense collagen and granular pigment; many are stellate in appearance. Their distribution is widespread: pleural based; interstitial; perivascular; and adjacent to the walls of respiratory bronchioles. These microscopic features are consistent with a complicated pneumoconiosis, as defined by the Black Lung Program Guidelines (U.S. Department of Labor - 8/92).

(Id.). In a section titled "Final Anatomical Diagnoses," the autopsy report listed, among other things, "[f]ibroanthracotic nodules (bilateral lungs) measuring up to 1.2 cm, compatible with complicated pneumoconiosis, as defined by the Black Lung Program Guidelines (U.S. Department of Labor - 8/92)." (Id. at 3).

During her deposition, Dr. Guerry-Force said that the "Black Lung Program Guidelines" she referred to in her autopsy report had been sent to her by the DOL's Employment Standards Administration during her evaluation of an earlier black

---

[3] For convenience, we use the ALJ's abbreviations for citations to the record.

lung case.  The guidelines, which are contained in a letter dated August 11, 1992 from the Employment Standards Administration to Dr. Guerry-Force, state in pertinent part

The presence of complicated pneumoconiosis is established if:

1.    The gross examination of the cut lung revealed a marked degree of simple pneumoconiosis and progressive massive fibrosis (massive lesions of the lung or large, dense fibrous masses) was present; and

2.    The microscopic examination revealed fibrotic mass or masses composed of carbon deposits and interlaced by bundles of dense fibrous tissues.

(DX 11 at 2).  Dr. Guerry-Force explained that her autopsy findings satisfied the guidelines' requirements for "complicated pneumoconiosis because of the size and extent of the nodules present."  (DX 11, Guerry-Force Dep. at 10).  Specifically, her gross examination

revealed a marked degree of simple pneumoconiosis and . . . larger areas of fibrosis that were one centimeter or greater in dimension, and that correlates with the ILO pulmonary lung classification for complicated, the larger nodules . . . . the microscopic examination also had the fibrotic masses.

(Id. at 11).  Finally, Dr. Guerry-Force also averred that pathologists are best able to make a diagnosis of complicated pneumoconiosis when they perform both a gross and microscopic examination because "the things you see grossly are not . . . necessarily in toto represented on the slides. . . ."  (Id. at 13).  In other words, a

7

gross examination allows a pathologist to "get an impression of the disease of the lung in toto . . . that one may not fully appreciate from the microscopic." (Id. at 15).

To counter Dr. Guerry-Force's opinion, P & M relied on the expert report of Dr. P. Raphael Caffrey and the expert report and testimony of Dr. Ben V. Branscomb. Because he did not perform the autopsy, Dr. Caffrey's opinion was limited to reviewing the autopsy slides prepared by Dr. Guerry-Force. Dr. Caffrey reported that the largest nodule he could find on the slides was 0.9 centimeters, and he, accordingly, concluded that Mr. Cornelius did not have complicated pneumoconiosis even under the standard applied by Dr. Guerry-Force. Dr. Branscomb agreed with Dr. Caffrey, opining that Mr. Cornelius had only simple, not complicated, pneumoconiosis. He also testified that the term "massive lesions" usually refers to complicated pneumoconiosis, and that "massive lesions" are generally the "size of a chicken egg," "the size of one-third of one lung," or "the size of a tennis ball." (Hearing Tr. at 40). Finally, Dr. Branscomb acknowledged that autopsy is more effective "by far" than x-rays for diagnosing coal workers' pneumoconiosis. (Id. at 44).

Based on Dr. Guerry-Force's opinion, the ALJ concluded that Ms. Cornelius was entitled to the irrebuttable presumption of causation provided in § 718.304, and, accordingly, awarded her benefits. See Cornelius v. Pittsburgh & Midway

8

Coal Mining Co., 2003-BLA-5015, slip. op. at 13 (Sept. 29, 2003). The Benefits Review Board ("BRB") vacated that decision and remanded the case for further consideration, because the ALJ had not explained which of the three criteria in § 718.304 Ms. Cornelius had satisfied. See Cornelius v. Pittsburg & Midway Coal Mining Co., BRB No. 04-0162 BLA, slip op. at 3 (Sept. 30, 2004) (per curiam) (unpublished decision).

On remand, the case was assigned to a new ALJ. After reviewing the record of the original formal hearing, the ALJ concluded that Dr. Guerry-Force's testimony was the most persuasive and that her testimony satisfied the requirements of §§ 718.304(b) and (c). Thus, the ALJ concluded that Ms. Cornelius established that her husband died "due to" pneumoconiosis and awarded her benefits. See Cornelius v. Pittsburg & Midway Coal Mining Co., 2003-BLA-5015, slip op. at 9 (July 29, 2005). The Benefits Review Board affirmed the ALJ's conclusion with respect to § 718.304(b), and, therefore, did not address his alternative conclusion that Ms. Cornelius also satisfied § 718.304(c). See Cornelius v. Pittsburg & Midway Coal Mining Co., BRB No. 05-0947 BLA, slip op. at 4-5 (July 27, 2006) (per curiam) (unpublished decision).

P & M then timely petitioned this Court to review the BRB's decision. We have jurisdiction over the petition because Mr. Cornelius worked as a coal miner in Alabama. See Slatick v. Director, OWCP, 698 F.2d 433, 434 (11th Cir. 1983).

9

The Director of the Office of Workers' Compensation Programs, U.S. Department of Labor ("Director") is a named respondent in these proceedings, see 30 U.S.C. § 932(k), and has elected to file a brief in support of Ms. Cornelius. Although Ms. Cornelius was a respondent before the BRB, she has chosen not to participate in the briefing or argument before this Court.

## II.

The standard of review applied to the BRB's affirmance of an ALJ's decision is by now well-established:

> Decisions of the ALJ are reviewable only as to whether they are in accordance with law and supported by substantial evidence in light of the entire record. This deferential standard of review binds both the BRB and this Court. Because this Court applies the same standard of review to ALJ decisions as does the BRB, our review of BRB decisions is de novo. Substantial evidence has been defined as more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . [W]hen the BRB upholds the ALJ's decision, this Court's limited review of the ALJ effectively cloaks the BRB's decision with the same deference to which the ALJ is entitled. Thus, although the case comes to us from the BRB, we begin our analysis by reviewing the decision of the ALJ.

U.S. Steel Mining Co. v. Director, OWCP, 386 F.3d 977, 984 (11th Cir. 2004) (internal quotation marks and citations omitted).

To receive survivor's benefits, a claimant "must establish that [the miner] [1] had pneumoconiosis, [2] that his pneumoconiosis was caused by coal mine employment, and [3] that his death was due to the disease." Bradberry v. Director,

10

OWCP, 117 F.3d 1361, 1365 (11th Cir. 1997); see also 20 C.F.R. § 718.205(a).[4]

Only the third element - - causation - - is at issue here.

As we have already observed, the black lung regulations provide three distinct methods of proving causation: a claimant must show either (1) that the miner's death was in fact caused by pneumoconiosis; (2) that pneumoconiosis was in fact a substantially contributing cause of the miner's death; or (3) that the irrebuttable presumption of causation contained in § 718.304 applies. See 20 C.F.R. § 718.205(c)(1)-(3). Here, the Director does not argue that pneumoconiosis or complications of the disease in fact caused or were in fact a substantially contributing cause of Mr. Cornelius's death. Consequently, Ms. Cornelius cannot establish causation under 20 C.F.R. §§ 718.205(c)(1) or (2), and she must therefore rely on the irrebuttable presumption contained in § 718.304.

P & M argues that Ms. Cornelius is not entitled to the irrebuttable presumption for two reasons. First, P & M says that because Mr. Cornelius's "principal cause of death was a medical condition not related to pneumoconiosis," Ms. Cornelius must show that pneumoconiosis was a "substantially contributing cause of death" under 20 C.F.R. § 718.205(c)(4), a showing that she has not and

---

[4] Ms. Cornelius "also had to show . . . that: (1) she was a surviving dependent of Mr. [Cornelius], 20 C.F.R. § 718.1; (2) Mr. [Cornelius] was a coal miner, 20 C.F.R. § 725.202; and (3) that [P & M] was a responsible operator, 20 C.F.R. § 725.491-.495." Perry v. Mynu Coals, Inc., 469 F.3d 360, 364 n.3 (4th Cir. 2006). None of these issues are contested, and, therefore, we have no occasion to address them.

11

apparently cannot make. Second, P & M asserts that, even if § 718.205(c)(4) does not apply when § 718.304 is satisfied, Dr. Guerry-Force's opinion is insufficient to satisfy any of the three criteria found in § 718.304. Neither argument is persuasive.

A.

To begin with, the regulation embodied in § 718.205(c)(4) states: "However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or the principal cause of death was a medical condition not related to pneumoconiosis, unless the evidence establishes that pneumoconiosis was a substantially contributing cause of death." 20 C.F.R. § 718.205(c)(4). According to P & M, this provision is a "catch-all" that applies to all of the previous subsections of § 718.205(c), including (c)(3), the subsection incorporating the "irrebuttable" presumption contained in § 718.304. P & M's interpretation creates an obvious conflict in the black lung regulations: § 718.304 provides for an "irrebuttable" presumption, but § 718.205(c)(4) would allow that presumption to be rebutted if death was in fact caused by "traumatic injury" or "a medical condition not related to pneumoconiosis" and pneumoconiosis was not in fact a "substantially contributing cause of death."

This seeming conflict is resolved easily by the plain language of the Black Lung Benefits Act. Section 411(c)(3) of the Act, which § 718.304 largely parrots,

12

unambiguously says that "there shall be an irrebuttable presumption" of causation if any of the three medical criteria in that section are met. 30 U.S.C. § 921(c)(3) (emphases added). Any interpretation of the relevant regulation, 20 C.F.R. § 718.205(c)(4), that allows this statutorily-created mandatory "irrebuttable" presumption somehow to be rebutted would be inconsistent, indeed would collide with the plain language of § 411(c)(3) and is therefore invalid. See, e.g., United States v. Larionoff, 431 U.S. 864, 873 (1977) ("[R]egulations, in order to be valid[,] must be consistent with the statute under which they are promulgated."); Lewis v. Barnhart, 285 F.3d 1329, 1333 (11th Cir. 2002) (per curiam) (where a regulation and statute conflict, the "more specific and authoritative words in the statute govern"); Ellis v. Gen. Motors Acceptance Corp., 160 F.3d 703, 709 (11th Cir. 1998) ("[R]egulations cannot trump the plain language of statutes." (internal quotation marks omitted)); S.J. Groves & Sons Co. v. Fulton County, 920 F.2d 752, 764 (11th Cir. 1991) ("[R]egulations must not be . . . inconsistent with the statute that authorizes them." (internal quotation marks omitted)).

P & M's interpretation would yield precisely that unacceptable result. Thus, for example, in this case, it is undisputed that Mr. Cornelius died from congestive heart failure, "a medical condition not related to pneumoconiosis," and it is undisputed that pneumoconiosis was not in fact a "substantially contributing cause of death." According to P & M's interpretation, Ms. Cornelius is not entitled to

13

benefits even if she otherwise meets the requirements of § 411(c)(3).  But this result cannot be squared with the plain language of § 411(c)(3), which says that once one of the three criteria enumerated in that provision is met, the presumption of death due to pneumoconiosis is "irrebuttable."  Since P & M's interpretation of § 718.205(c)(4) undeniably conflicts with the clear text of § 411(c)(3), we reject it and hold that § 718.205(c)(4) does not apply to claimants who are entitled to an irrebuttable presumption of causation under § 718.304.  Accord Gray v. SLC Coal Co., 176 F.3d 382, 387 (6th Cir. 1999) ("[B]ecause both the statute (30 U.S.C. § 921) and its interpretive regulation (20 C.F.R. § 718.304) use the term 'irrebuttable,' the Director's reconciliation of § 718.205(c)(4) with the statute appears to be legally sound."); USX Corp. v. Director, OWCP, No. 93-1134, 1994 WL 89391, at *3 (4th Cir. Mar. 21, 1994) (unpublished decision) ("Adoption of the employer's view would not only render the 'irrebuttable' presumption of section 718.304 rebuttable in traumatic injury cases, but also, under the language of section 718.205(c)(4), open the door to attempts at rebuttal whenever 'the principal cause of death was a medical condition not related to pneumoconiosis.' The effect of this construction would be to create a plethora of possibilities where a presumption the regulations term 'irrebuttable' would become rebuttable." (internal quotation marks and citation omitted)).

Finding no room to maneuver in the text of § 411(c)(3), P & M makes one final argument: the 1981 amendments to the Black Lung Benefits Act implicitly require all claimants to show that pneumoconiosis played some part in the miner's death. P & M is plainly wrong. Prior to the 1981 amendments, the Act provided benefits to the survivors of miners (1) who died due to pneumoconiosis or (2) who were totally disabled due to pneumoconiosis at the time of death. The 1981 amendments to the BLBA eliminated the second basis for survivor's benefits. See Black Lung Benefits Act Amendments of 1981, Pub. L. No. 97-119, § 203(a)(4), 95 Stat. 1635, 1644 (1981). Accordingly, a survivor is no longer entitled to benefits simply because the miner was totally disabled during his lifetime; the survivor must prove that the miner died "due to" pneumoconiosis. See Bradberry, 117 F.3d at 1364 n.9 (explaining that, under the current version of the Act, "[a]lthough the issue of total disability is relevant to a claim by a miner, it is not relevant to a claim for survivor's benefits"). Notably, however, the 1981 amendments did not repeal or in any way alter the critical language creating an irrebuttable presumption found in § 411(c)(3). Thus, the 1981 amendments do not change the fact that a survivor may be entitled to an "irrebuttable" presumption that the miner died "due to" pneumoconiosis if she can meet any of the three criteria set out in § 411(c)(3), irrespective of whether pneumoconiosis contributed in any way to the miner's death.

15

Quite simply, once a claimant has established that the requirements of §

411(c)(3) are met, the irrebuttable presumption operates to establish conclusively

that the miner died "due to" pneumoconiosis, and the claimant's obligation to

prove causation is therefore satisfied.

B.

Having failed to convince us that the plain language of the statute can be

ignored, P & M also argues that Dr. Guerry-Force's expert opinion is an

insufficient foundation to establish any of the irrebuttable presumption's three

medical criteria. We remain unpersuaded.

Under both the relevant statute (§ 411(c)(3)) and regulation (§ 718.304), a

claimant is entitled to an irrebuttable presumption of causation if she shows by a

preponderance of the evidence that the miner's x-rays revealed opacities larger

than 1 centimeter in diameter (§ 411(c)(3)(A); § 718.304(a)), that the miner's

autopsy or biopsy revealed "massive lesions" (§ 411(c)(3)(B); § 718.304(b)), or

that a diagnosis by other means reveals a condition that could reasonably be

expected to yield opacities of greater than 1 centimeter or massive lesions if the

diagnosis had been made by x-ray or autopsy, respectively (§ 411(c)(3)(C); §

718.304(c)).[5]

_____

[5] The claimant must also show that the pathological symptoms are caused by "a chronic
dust disease of the lung," as opposed to some other cause, such as smoking. 30 U.S.C. §
921(c)(3); 20 C.F.R. § 718.304. P & M does not assert, however, that the lesions in Mr.

16

The parties agree that Ms. Cornelius did not produce x-ray evidence sufficient to satisfy § 718.304(a). The case, therefore, turns on whether substantial evidence supports the ALJ's conclusion that §§ 718.304(b) or (c) were met. Notably, P & M does not challenge the ALJ's conclusion that Dr. Guerry-Force's opinion was entitled to more weight than P & M's expert witnesses, Dr. Caffrey and Dr. Branscomb. In light of that concession, the sole issue before us is whether Dr. Guerry-Force's testimony provides substantial evidence in support of the ALJ's conclusion that Ms. Cornelius satisfied either §§ 718.304(b) or (c).

Our analysis begins and, as it turns out, ends with § 718.304(b), which creates an irrebuttable presumption that a miner died "due to" pneumoconiosis if an autopsy reveals "massive lesions" in his lungs. 20 C.F.R. § 718.304(b); see 30 U.S.C. § 921(c)(3)(B). The meaning of the term "massive lesions" is an issue of first impression in this Circuit. Based on the testimony of Dr. Branscomb, P & M argues that "massive lesions" refers to lesions the size of a chicken egg or one-third of one lung, significantly larger than the 1.2 centimeter lesion found by Dr. Guerry-Force. The Director, on the other hand, suggests that P & M's chicken-egg standard has no medical basis, and that "[t]he term 'massive lesions' is merely one of several ways of describing the condition known as complicated

_____

Cornelius's lungs were caused by something other than pneumoconiosis.

17

pneumoconiosis." Respondent's Br. at 26. The Director has the better of the

argument.[6]

---

[6] The level of deference we owe to the Director's interpretation of the term "massive lesions" is an interesting and open question. The term "massive lesions" appears in 20 C.F.R. § 718.304, and, ordinarily, we defer to the Director's consistent interpretations of the black lung regulations unless they are "plainly erroneous or inconsistent with the regulation." U.S. Steel Mining Co., 386 F.3d at 985 (internal quotation marks and citation omitted). But this highly deferential standard may not apply if the agency "formulate[s] a regulation that merely parrots the statute it is designed to implement." Mahon v. U.S. Dep't of Agriculture, 485 F.3d 1247, 1258 (11th Cir. 2007) (citing Gonzalez v. Oregon, 546 U.S. 243 (2006)). It would be difficult to argue that § 718.304(b) does anything more than parrot § 411(c)(3)(B), because both use the same language. See Gonzalez, 546 U.S. at 257 (concluding that where a regulation "repeats two statutory phrases and attempts to summarize the others," it is a parroting regulation). Perhaps the Director could argue (although he has not) that his interpretation is entitled to Chevron deference because the term "massive lesions" appears in the statute as well as the regulation, and the Secretary is empowered to illuminate ambiguities in the statute through formal rulemaking. But simply because an agency is empowered to make rules with the force of law does not mean that Chevron deference automatically applies to any form its statutory interpretations may take. See Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters - - like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law - - do not warrant Chevron-style deference."); see also S.D. Warren Co. v. Me. Bd. of Envtl. Protection, 126 S. Ct. 1843, 1848 (2006) ("[B]ecause neither the EPA nor FERC has formally settled the definition, or even set out agency reasoning, these expressions of agency understanding do not command deference from this Court."). Notably, the Director's interpretation here comes in a legal brief, not a regulation promulgated through notice-and-comment rulemaking, and we have previously suggested that such interpretations are entitled to only Skidmore deference. See Wilderness Watch v. Mainella, 375 F.3d 1085, 1091 n.7 (11th Cir. 2004) (explaining in dicta the level of deference owed to an interpretation advanced in an agency's brief this way: "[W]hen, as here, the agency interpretation does not constitute the exercise of its formal rule-making authority, we accord the agency consideration based upon the factors cited in Skidmore . . . ."). Indeed, it would be odd to refuse significant deference to an interpretation under Gonzalez, yet give the same interpretation traditional Chevron deference.

At the end of the day, however, we need not determine the exact level of deference (if any) owed to the Director's interpretation of the term "massive lesions," because we would adopt his position "even if there were no formal rule and we were interpreting the statute from scratch." Edelman v. Lynchburg College, 535 U.S. 106, 114 (2002). Because we ultimately agree with the Director, "there is no occasion to defer and no point in asking what kind of deference, or how much." Id.; see also, e.g., Wilderness Watch, 375 F.3d at 1091 n.7 (deciding the case at Chevron step one and thus concluding that "we need not resolve the question of the precise level of deference due the agency action under the second prong of Chevron").

Neither the Act nor the regulations defines the term "massive lesions." Although we would normally turn to the ordinary meaning of the words, dictionary definitions of the word "massive" are of little use here. Therefore, we are obliged to examine other indicia of legislative intent, case law interpreting the Black Lung Benefits Act, and the regulatory history of the black lung regulations. All of these sources lend support to the Director's position that Congress intended the term "massive lesions" to refer to the medical condition known as complicated pneumoconiosis.

The BLBA was originally passed as Title IV of the Federal Coal Mine Health and Safety Act of 1969 (the "1969 Act"), Pub. L. No. 91-173, 83 Stat. 792. (Title IV was renamed the Black Lung Benefits Act in 1972.) Included in the legislative history of the 1969 Act is a report of the Surgeon General on coal workers' pneumoconiosis. Summarizing that report, the Supreme Court has explained that the medical community generally classifies pneumoconiosis as being either "simple" or "complicated," with the latter form generally being more debilitating and producing more pronounced pathological effects:

> Simple pneumoconiosis, ordinarily identified by X-ray opacities of a limited extent, is generally regarded by physicians as seldom productive of significant respiratory impairment. Complicated pneumoconiosis, generally far more serious, involves progressive massive fibrosis as a complex reaction to dust and other factors (which may include tuberculosis or other infection), and usually produces significant pulmonary impairment and marked respiratory

19

> disability. This disability limits the victim's physical capabilities, may induce death by cardiac failure, and may contribute to other causes of death.

Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 7 (1976) (footnotes omitted).

The House-passed version of the bill that became the 1969 Act compensated only the survivors of miners who suffered from complicated (as opposed to simple) pneumoconiosis, and that bill defined the term "complicated pneumoconiosis" using specific medical criteria. See H. Rep. No. 91-563, reprinted in 1969 U.S.C.C.A.N. 2503, 2542 ("[T]his section provides for payments of compensation . . . in respect of the death of an individual who, at the time of his death, was suffering from complicated pneumoconiosis . . . ."). In conference, all references to "complicated pneumoconiosis" were eliminated and coverage was expanded to all miners who were totally disabled due to "pnuemoconiosis" and to the survivors of all miners who died due to "pneumoconiosis," which the conference bill defined simply as "a chronic dust disease of the lung arising out of employment in an underground coal mine." Pub. L. No. 91-173, § 402(b), 83 Stat. 793. The House's definition of "complicated pneumoconiosis" was not ignored entirely, however. Instead, the conference bill incorporated the House's definition of "complicated pneumoconiosis" (but not the term itself) into the newly created § 411(c)(3). See Usery, 428 U.S. at 23 n.22 (noting that the House bill "contained the diagnostic criteria presently embodied in § 411(c)(3)"). Thus, under the BLBA as enacted, a

claimant is entitled to an irrebuttable presumption of causation under § 411(c)(3) if she satisfies the House's definition of "complicated pneumoconiosis," though the term "complicated pneumoconiosis" does not appear in the Act. Although a court must tread very carefully when reviewing the evolution of a statute prior to enactment, we believe this legislative history supports the Director's position that the term "massive lesions" is another way of referring to the medical condition known as complicated pneumoconiosis.

Likewise, when discussing causation under the BLBA, the Supreme Court and this Court have equated the criteria embodied in § 411(c)(3) with complicated pneumoconiosis. In Usery, for example, the Supreme Court said that "§ 411(c)(3) provides that clinical evidence of a miner's complicated pneumoconiosis gives rise to an irrebuttable presumption that . . . his death was due to pneumoconiosis." 428 U.S. at 24; see also id. at 10-11 ("Under § 411(c)(3), [if] a miner [is] shown by X-ray or other clinical evidence to be afflicted with complicated pneumoconiosis . . . it is irrebuttably presumed that . . . his death was due to pneumoconiosis."); id. at 20 ("[I]f a miner can show by clinical evidence . . . that he is afflicted with complicated pneumoconiosis . . . then the miner is deemed to be totally disabled under § 411(c)(3)."); Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 685 (1991) (describing § 411(c)(3) as creating an irrebuttable presumption when "a miner present[s] medical evidence demonstrating complicated pneumoconiosis"); id. at

21

703 n.8 (describing § 411(c)(3) as "applicable to a miner for whom the medical evidence demonstrates the presence of complicated pneumoconiosis").

Similarly, in Alabama By-Products Corp. v. Killingsworth, 733 F.2d 1511, 1517 n.11 (11th Cir. 1984), this Court noted that "Section 411(c)(3) raises an irrebuttable presumption that a miner . . . has died as a result of . . . pneumoconiosis if the miner is clinically shown to have 'complicated' pneumoconiosis." Other Circuits have made similar observations. See, e.g., Freeman United Coal Min. Co. v. Foster, 30 F.3d 834, 835 (7th Cir. 1994) ("[A]ny miner suffering from complicated pneumoconiosis is irrebuttably presumed to be totally disabled by that disease." (citing 30 U.S.C. § 921(c)(3)); Peabody Coal Co. v. Director, OWCP, 972 F.2d 178, 181 (7th Cir. 1992) (referring to the "medical evidence of complicated pneumoconiosis set forth at 718.304"); Lukosevicz v. Director, OWCP, 888 F.2d 1001, 1003 (3d Cir. 1989) (same). Although none of these decisions addressed the question we examine here, they support the Director's position that § 411(c)(3) refers to the diagnostic criteria for complicated pneumoconiosis.

Finally, the regulatory history of the black lung regulations discusses § 411(c)(3) in terms of complicated pneumoconiosis. Thus, for example, while amending the black lung regulations in 2000, the Department of Labor described § 411(c)(3) as creating an "irrebuttable presumption . . . invoked by proof of

22

complicated pneumoconiosis." Regulations Implementing the Federal Coal Mine Health and Safety Act, as Amended, 65 Fed. Reg. 79920, 79936 (Dec. 20, 2000).

Taken together, the legislative history of the Act, the case law, and the regulatory history of the black lung regulations suggest that § 411(c)(3) refers to the medical criteria for diagnosing complicated pneumoconiosis on autopsy. Certainly, none of these sources even hints that "massive lesions" means lesions the size of a chicken egg or one-third of one lung, as P & M contends. We are satisfied that the term "massive lesions" means lesions revealed on autopsy or biopsy that support a diagnosis of complicated pneumoconiosis. Because "massive lesions" is simply a shorthand for complicated pneumoconiosis, we agree with the BRB's conclusion that a physician need not employ the magic words "massive lesions" in order to satisfy the requirements found in § 718.304(b). It is sufficient if the claimant can establish by a preponderance of the evidence that the miner's autopsy or biopsy results are consistent with a diagnosis of complicated pneumoconiosis under accepted medical standards. See Gruller v. BethEnergy Mines, Inc., 16 Black Lung Rep. 1-3 (Ben. Rev. Bd. 1991) (per curiam) (evidence is sufficient if it "adequately describe[s] the condition comprehended by the regulatory term, 'massive lesions'").

The question, then, boils down to this: whether Dr. Guerry-Force applied proper medical standards in concluding that the numerous lesions in Mr.

23

Cornelius's lungs, which included at least one lesion as large as 1.2 centimeters in diameter, constituted complicated pneumoconiosis. Although the proper standard for diagnosing complicated pneumoconiosis on autopsy is far from clear, we conclude that the ALJ did not commit reversible error in accepting her diagnosis.

At present, the DOL has promulgated no specific standards for diagnosing complicated pneumoconiosis on autopsy. As recently as 2000, the DOL rejected a commentor's suggestion that it adopt a two-centimeter minimum size for "massive lesions" because such a standard was not "universally accepted" as being "necessary for a diagnosis of complicated pneumoconiosis." 65 Fed. Reg. 79936. Indeed, the DOL refused to promulgate <u>any</u> specific minimum-size threshold, apparently because of "the lack of a prevailing standard in the medical community." Respondent's Br. at 26 n.10. Instead, as the Director explained, the DOL has elected to proceed in a common-law fashion, requiring ALJs to carefully examine the medical evidence presented to determine whether complicated pneumoconiosis exists on the unique facts of each case.

Although this approach may present the possibility of conflicting results on similar facts, surely it is one reasonable way of dealing with the demonstrable lack of any medical consensus on this issue. Moreover, the Supreme Court has explained the justification for granting deference to the Secretary's implementation of the Act this way:

24

> The [BLBA] has produced a complex and highly technical regulatory program. The identification and classification of medical eligibility criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns. In those circumstances, courts appropriately defer to the agency entrusted by Congress to make such policy determinations.

Pauley, 501 U.S. at 697. "Further," the Supreme Court has observed, "the delegation [to the Secretary] was made with the intention that the program evolve as technological expertise matured" so that the Secretary could "'incorporate within his regulations . . . to the extent feasible the advances made by medical science in the diagnosis and treatment of pneumoconiosis. . . .'" Id. at 697-98 (quoting S. Rep. No. 95-209 at 13 (1977)) (ellipses in original). Based on the regulatory history of the black lung regulations and the Director's position in this case, it appears that medical science has not yet advanced to the point of developing a precise, objective standard for diagnosing complicated pneumoconiosis on autopsy. Because of the lack of consensus, the expertise undeniably required to formulate standards for medical causation, the policy-laden judgments inherent in establishing medical eligibility criteria in black lung cases, and the deference we owe to the Secretary's implementation of the Black Lung Benefits Act, we accept the Secretary's case-by-case approach for determining whether a miner's autopsy results support a diagnosis of complicated pneumoconiosis. See Pauley, 501 U.S. at 698-99 (holding that the Secretary's

implementation of the BLBA's requirements was entitled to deference); see also

U.S. Steel Mining Co., 386 F.3d at 988-89 (deferring to the Director's

interpretation of the black lung regulations); Bradberry, 117 F.3d at 1366-67

(same); Lollar v. Ala. By-Products Corp., 893 F.2d 1258, 1262 (11th Cir. 1990)

("We owe . . . deference . . . to the Director . . . as the relevant policymaker in this

case . . . .").

Accordingly, we conclude that, until the Secretary provides further guidance

on this matter, § 411(c)(3)(B) and § 718.304(b) are met if a preponderance of the

evidence establishes that the miner's autopsy reveals lesions that support a

diagnosis of complicated pneumoconiosis. If, as in this case, the parties present

conflicting medical opinions, the ALJ must consider the totality of the evidence

and make relevant credibility determinations and findings of fact, subject to

substantial evidence review by the BRB and this Court.[7]

---

[7] To the extent that the Fourth Circuit has required claimants relying on § 411(c)(3)(B) to show that the lesions, if x-rayed, would "show as opacities greater than one centimeter in diameter," we decline to follow it. Double B Mining Inc. v. Blankenship, 177 F.3d 240, 243 (4th Cir. 1999); see also Gray, 176 F.3d at 390 (§ 411(c)(3)(B) is satisfied if either the test later adopted by the Fourth Circuit in Blankenship is met or there is testimony that the nodule discovered on autopsy is a "massive lesion"). In Blankenship, the Fourth Circuit held that equivalency determinations between § 411(c)(3)(A)'s x-ray standard and § 411(c)(3)(B)'s autopsy and biopsy standard were essential "to make certain that regardless of which diagnostic technique is used, the same underlying condition triggers the irrebuttable presumption." 177 F.3d at 243. "Because [§ 411(c)(3)(A)] sets out an entirely objective scientific standard," the Fourth Circuit observed, "it provides the mechanism for determining equivalencies under [§ 411(c)(3)(B)] or [§ 411(c)(3)(C)]." Id. Accordingly, the Fourth Circuit concluded that "'massive lesions' . . . are lesions that when x-rayed, show as opacities greater than one centimeter in diameter." Id.

26

In our view, Blankenship's equivalency requirement has at least four basic shortcomings. First, it conflates the x-ray criteria in § 411(c)(3)(A) with the autopsy criteria found in § 411(c)(3)(B). Notably, Congress separated the subsections in § 411(c)(3) by the word "or," indicating that they were meant to be distinct alternatives. See United States v. Garcia, 718 F.2d 1528, 1532-33 (11th Cir. 1983) ("The use of a disjunctive in a statute indicates that alternatives were intended."). We cannot read the word "or" out of the statute simply because it may yield a less "objective" test. Second, interpreting § 411(c)(3)(B) and § 718.304(b) to require an equivalency determination between autopsy results and x-rays may render those provisions superfluous in light of § 411(c)(3)(C) and § 718.304(c), which may already allow equivalency determinations between x-rays and autopsies. See Clites v. Jones & Laughlin Steel Corp., 663 F.2d 14, 16 (3d Cir. 1981) (affirming an ALJ's equivalency determination between autopsy findings and expected x-ray results); see also TRW, Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). Third, as the Supreme Court has noted, the legislative history to the 1969 Act acknowledges that post-mortem examinations reveal a greater prevalence of pneumoconiosis than x-ray diagnosis. See Usery, 428 U.S. at 32 ("[A]utopsy frequently disclose[s] pneumoconiosis where X-ray evidence ha[s] disclosed none . . . ."). It would be anomalous indeed to accord paramount importance to the perceived objectivity of x-rays even though autopsies are more accurate. (Notably, P & M's expert, Dr. Branscomb, also conceded that autopsies are "by far" the most effective way to diagnose pneumoconiosis.) Fourth, the Black Lung Benefits Act expressly forbids rejecting claims "solely on the basis of the results of a[n] [x-ray]," 30 U.S.C. § 923(b), suggesting that Congress did not intend "objective" x-ray results to be the be-all-end-all standard by which all other diagnoses were judged. Finally, we observe that the Solicitor General has previously expressed some of the same concerns about the Fourth Circuit's interpretation of § 411(c)(3). See Brief for the Federal Respondent in Opposition at 7-8, Gollie v. Elkay Mining Co., cert. denied, 543 U.S. 925 (2004) (No. 04-39).

For all of these reasons, we conclude that § 411(c)(3)(B) and § 718.304(b) do not require that an equivalency determination be made between autopsy findings and x-rays. Those provisions focus on what the autopsy itself reveals, rather than on what the autopsy results might look like on a hypothetical x-ray. We do not mean to imply that § 411(c)(3)(A) is wholly irrelevant to the interpretation of § 411(c)(3)(B). Pneumocotic lesions appear as opacities on an x-ray, though there does not appear to be an exact, predictable correlation between the size of a lesion found on autopsy and the size of the opacity that same lesion would produce if x-rayed. Under § 411(c)(3)(A), "large" opacities are "greater than one centimeter in diameter." 30 U.S.C. § 921(c)(3)(A). As discussed in the text, § 411(c)(3)(B) does not define "massive" lesions, but it could be argued that, because the word "massive" connotes something bigger than the word "large," reading the two subsections in pari materia requires "massive lesions" to be even larger than the "greater than one centimeter in diameter" required for merely "large" opacities. We need not address this issue, however, because Dr. Guerry-Force found at least one lesion as large as 1.2 centimeters in diameter, and we are satisfied that 1.2 centimeters is sufficiently greater

27

Applying substantial evidence review here, we have little difficulty concluding that the ALJ did not commit reversible error in finding that Dr. Guerry-Force's autopsy report and deposition testimony established that Mr. Cornelius had "massive lesions" in his lungs. Dr. Guerry-Force's gross and microscopic examinations of Mr. Cornelius's lungs revealed, among other things, numerous lesions, at least one of which measured 1.2 centimeters in diameter. Dr. Guerry-Force then explained how her findings satisfied each of the criteria for diagnosing complicated pneumoconiosis enumerated in a letter she previously received from the DOL's Employment Standards Administration. Absent persuasive contrary evidence - - and in this case P & M has not challenged the ALJ's credibility determinations - - and given our deferential standard of review, that is enough. See Gruller, 16 Black Lung Rep. 1-3 (affirming ALJ's finding that the irrebuttable presumption had been met where the autopsy report "diagnosed complicated pneumoconiosis" and described "large, firm and black" lesions measuring "up to 1.0 cm in diameter").

## III.

In sum, we agree with the Benefit Review Board's conclusion that substantial evidence supports the ALJ's finding that Ms. Cornelius is entitled to an irrebuttable presumption of causation under § 411(c)(3)(B) of the Act and 20

---

than 1 centimeter to qualify as "massive" even under this interpretation of § 411(c)(3)(B).

28

C.F.R. § 718.304(b).   Therefore, like the BRB, we do not reach the ALJ's alternative finding that Ms. Cornelius also satisfied § 411(c)(3)(C) and § 718.304(c).   Accordingly, P & M's petition for review is

**DENIED**.