[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 28, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-15346

_____

D. C. Docket No. 02-00093-CV-AAA-2

WILDERNESS WATCH AND PUBLIC
EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY,

Plaintiffs-Appellants,

versus

FRAN P. MAINELLA,
Director, National Park Service,
UNITED STATES DEPARTMENT OF THE INTERIOR,
ARTHUR FREDERICK,
Superintendent, Cumberland Island
National Seashore,
GREYFIELD INN CORP.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(JUNE 28, 2004)

Before BARKETT and KRAVITCH, Circuit Judges, and FORRESTER*, District
Judge.

_____

*Honorable J. Owen Forrester, United States Senior District Judge for the Northern
District of Georgia, sitting by designation.

BARKETT, Circuit Judge:

Wilderness Watch appeals the grant of summary judgment to the National Park Service on its complaint seeking to enjoin the Park Service's practice of using motor vehicles to transport visitors across the designated wilderness area on Cumberland Island, Georgia. Wilderness Watch asserts that this practice violates the Wilderness Act, 16 U.S.C. §§ 1131-36, and also that the Park Service made the decision to transport tourists without conducting the investigation and analysis of potential environmental impact required by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4331-35. Finally, Wilderness Watch claims that the Park Service established an advisory committee without the public notice and participation required by the Federal Advisory Committee Act, 5 U.S.C. App. 2, rendering the agreement signed following those meetings invalid and unenforceable.[1]

We review de novo a grant of summary judgment, applying the same legal standards used by the district court. Shotz v. City of Plantation, 344 F.3d 1161,

---

[1]Wilderness Watch also challenged the Park Service's decision to permit Grayfield Inn, a private hotel operating in the southern part of the island, to conduct daily motorized tours for its guests through wilderness areas. The district court remanded these claims to the agency for a determination of the scope of Grayfield's private rights that pre-dated the designation of the wilderness areas. These claims are not at issue in this appeal.

2

1165 (11th Cir. 2003). The Administrative Procedure Act, which governs review of agency action, permits courts to set aside agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## I. The Wilderness Act

### A.

Mindful of our "increasing population, accompanied by expanding settlement and growing mechanization," Congress passed the 1964 Wilderness Act in order to preserve and protect certain lands "in their natural condition" and thus "secure for present and future generations the benefits of wilderness." 11 U.S.C. § 1131(a). The Act recognized the value of preserving "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." Id. at § 1131(c). Congress therefore directed that designated wilderness areas "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness." Id. at 1131(a).

Cumberland Island, which features some of the last remaining undeveloped

3

land on the barrier islands along the Atlantic coast of the United States, was declared by Congress to be a National Seashore in 1972. Ten years later, Congress designated as wilderness or potential wilderness[2] some 19,000 acres, including most of the northern three-fifths of the island. See P.L. 97-250, 96 Stat. 709 (Sept. 8, 1982). Under the aegis of the Secretary of the Interior, the Park Service thus became responsible for administering the wilderness area "in accordance with the applicable provisions of the Wilderness Act." Id. at § 2(c). Today, visitors to Cumberland Island must leave their vehicles on the mainland and travel to the island by boat.

In addition to wilderness area, Park Service land includes several buildings and facilities on the southern end of the island as well as two historical areas on the

---

[2]Potential wilderness areas contain certain temporary conditions that do not conform to the Wilderness Act. They are to receive full wilderness designation when the Secretary of the Interior determines that "uses prohibited by the Wilderness Act have ceased." P.L. 97-250 § 2(a). Park Service policy "is to treat potential wilderness in exactly the same manner as wilderness." R. at 2-17 Ex. 1 (declaration of Cumberland Island Superintendent Arthur Frederick). The Park Service wilderness manual states that:

> [M]anagement decisions made pertaining to lands qualifying as wilderness will be made in expectation of eventual wilderness designation. This policy also applies to potential wilderness, requiring it to be managed as wilderness to the extent that existing non-conforming uses allow. The National Park Service will seek to remove the temporary non-conforming conditions that preclude wilderness designation. All management decisions affecting wilderness will further apply the concepts of 'minimum requirements' for the administration of the area regardless of wilderness category.

National Park Service, Reference Manual 41: Wilderness Preservation and Management at 14 (1999)

northern and western coasts: Plum Orchard, just outside the wilderness boundary,

and the Settlement, located in potential wilderness area.[3]  Historically, these two

locations have been reached via the "Main Road," a one-lane dirt road that has also

been designated as part of the wilderness and potential wilderness areas.

Once federal land has been designated as wilderness, the Wilderness Act

places severe restrictions on commercial activities, roads, motorized vehicles,

motorized transport, and structures within the area, subject to very narrow

exceptions and existing private rights.  Specifically, the relevant section provides:

> Except as specifically provided for in this chapter, and subject to existing
> private rights, there shall be no commercial enterprise and no permanent
> road within any wilderness area designated by this chapter and, except as
> necessary to meet minimum requirements for the administration of the area
> for the purpose of this chapter (including measures required in emergencies
> involving the health and safety of persons within the area), there shall be no
> temporary road, no use of motor vehicles, motorized equipment or
> motorboats, no landing of aircraft, no other form of mechanical transport,
> and no structure or installation within any such area.

16 U.S.C. § 1133(c).  Thus, aside from exceptions not relevant here,[4] the statute

permits the use of motor vehicles and transport only "as necessary to meet

---

[3]Plum Orchard, a mansion complex commissioned by Thomas Carnegie in the late nineteenth century, lies some two-and-one-half miles from the wilderness boundary on the western coast. The Settlement, the remnants of an area occupied by a group of freed slaves after the Civil War, lies another six miles north of Plum Orchard.

[4]Neither "existing private rights" nor the exceptions "specifically provided for in this chapter" are relevant to this appeal.  See 16 U.S.C. § 1133(d) (describing the special exceptions for aircraft, motorboats, fire, insects, disease, mining and mineral activities, water resources, certain specific commercial services, and state jurisdiction over wildlife).

minimum requirements for the administration of the area for the purpose of this chapter." Id.

Following the wilderness designation, the Park Service continued to use the existing one-lane dirt road to access the historical areas.[5] Motorized transportation on Cumberland Island became a controversial issue in the 1990s, as the federal government sought to obtain remaining private tracts on the island and various groups called for greater public access to and support of the historical sites. An informal group of environmental organizations, historical societies, and local residents met several times in an attempt to discuss and ultimately to influence Park Service policy. Jack Kingston, the representative to Congress from the district including Cumberland, introduced legislation that would have removed the wilderness designation from the roads leading to the historical sites. This bill died in committee in 1998, but later that year the Park Service convened the first of two meetings with many of the same interested parties in an attempt to negotiate a solution to the conflict over its policies. In February 1999 the Park Service agreed to provide regular public access to Plum Orchard and the Settlement via Park Service motor vehicles until boat service could be established.

The Park Service claimed that it needed motorized access to the historical

---

[5]The record does not contain any contemporaneous logs or records that document the frequency of Park Service use prior to the transportation of tourists.

areas in order to "meet[] its obligations to restore, maintain, preserve and curate the historic resources . . . and permit visitor access and interpretation." R. at 4-46-559, 562. The Service also claimed that permitting tourists to "piggyback" along on Park Service personnel trips to these locations would yield "no net increase in impact,"—that is, the number of trips and overall impact on the area would be no greater than if the Park Service were simply meeting its statutory obligations. Id. For the first two months, the Park Service used vehicles that held four passengers, but the agency soon acquired a fifteen-person van in order to accommodate larger numbers of visitors. The Park Service offered trips to Plum Orchard three times per week and to the Settlement once per month. Although the Park Service had not previously visited the sites on a regular schedule, the agency decided to establish a regular schedule in order to accommodate the transportation of visitors.[6]

---

[6]In September 2002, four months after this litigation commenced, the Park Service established boat service to Plum Orchard and discontinued land transportation of tourists to that site. See R. at 6-63 (Cumberland Island National Seashore Policy Memorandum 2003-01) ("Henceforth, all tourist transport to Plum Orchard Mansion and historic grounds offered by CUIS shall be via boat. No motorized tours to the Mansion by Seashore personnel are authorized."). The district court concluded that this rendered moot the claims relating solely to Plum Orchard. We note that the party asserting mootness bears "the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000) (internal punctuation marks omitted). We have also stated previously that the "mere voluntary cessation of a challenged practice" does not render a claim moot, because the party could simply resume the practice following the conclusion of litigation. Jews for Jesus, Inc. v. Hillsborough County Aviation Auth., 162 F.3d 627, 629 (11th Cir. 1998).

However, the record indicates that the Park Service always intended to shift from land service to boat service so long as the latter proved feasible. See R. at 4-46-585 (1999 Plum Orchard Minimum Requirements Determination); R. at 4-46-23 (1984 General Management

Wilderness Watch objects to this arrangement, arguing that the Wilderness Act restricts motorized vehicle use within wilderness areas to the minimum necessary for an agency to meet its administrative needs for the purpose of the Wilderness Act and not for any other purpose. Thus, Wilderness Watch argues, the statute prohibits the Park Service from offering these "piggybacked" tours to visitors.

The Park Service, on the other hand, reads the statute to allow visitors to ride along with its employees as they travel to Plum Orchard and the Settlement to perform what they claim is administrative and maintenance work on those properties. The Service claims that the Act allows land designated as wilderness to be devoted to multiple purposes, citing as authority 16 U.S.C. § 1133(b), which provides that "wilderness areas shall be devoted to the public purposes of recreational, scenic, scientific, educational, conservation, and historical use." Thus, the Park Service argues, because it has a separate duty to preserve the historical structures at the Settlement, the "preservation of historic structures in

Plan for Cumberland Island). In light of the longstanding plans to switch to boat service, the unequivocal language of the policy memorandum, and the Park Service's declaration that any subsequent change in this policy would require "thorough legal and policy review, including an analysis of the environmental impacts to the extent required by [NEPA]," R. at 6-63-1, we agree that there is no "reasonable expectation that the challenged practice will resume" once the litigation ends. Jews for Jesus, 162 F.3d at 629 (internal quotation marks omitted). Of course, if the Park Service does reconsider its policy with respect to Plum Orchard in the future, that decision will be governed by the Wilderness Act and by NEPA, as construed in this opinion.

8

wilderness (or, as here, potential wilderness) is in fact administration to further the purposes of the Wilderness Act." Appellees' Br. at 32.

This dispute thus requires us to interpret the limitations imposed on motor vehicle use under the Wilderness Act, in particular the requirement that motor vehicle use be restricted to the level "necessary to meet minimum requirements for the administration of the area," 16 U.S.C. § 1133(c). We must also determine the effect of the Act upon the Park Service's obligations to maintain the historical structures on Cumberland Island and whether the Act can accommodate the Park Service's decision to transport tourists for the purpose of visiting those structures.

We analyze the Park Service's interpretation of the statutory phrase "except as necessary to meet minimum requirements for the administration of the area" under the two-step analysis described in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), and clarified in United States v. Mead Corp., 533 U.S. 218 (2001). Under Chevron, we first ask whether congressional intent is clear, and if so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43. We examine congressional intent through the plain language of the statute, understanding that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." FDA v. Brown &

9

Williamson Tobacco Corp., 529 U.S. 120, 133 (2000). If we find the statute silent or ambiguous, we defer to the agency interpretation "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226-27.[7]

**B.**

As an initial matter, we cannot agree with the Park Service that the preservation of historical structures furthers the goals of the Wilderness Act. The Park Service's responsibilities for the historic preservation of Plum Orchard and the Settlement derive, not from the Wilderness Act, but rather from the National Historic Preservation Act (NHPA), 16 U.S.C. § 461, et seq. The NHPA requires agencies to "assume responsibility for the preservation of historic properties" they control. Id. at § 470h-2(a)(1). Plum Orchard and the historic district containing

---

[7]Because we hold that the Wilderness Act speaks directly to the question at issue, we need not resolve the question of the precise level of deference due the agency action under the second prong of Chevron. We note, however, that when, as here, the agency interpretation does not constitute the exercise of its formal rule-making authority, we accord the agency consideration based upon the factors cited in Skidmore v. Swift & Co., 323 U.S. 134 (1944): "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id. at 140. See also Mead, 533 U.S. at 228 (listing these factors and citing Skidmore).

10

the Settlement have both been listed in the National Register of Historic Places,[8] though the congressional reports and early Park Service reports only mention Plum Orchard (which itself lies outside the designated wilderness area).

The agency's obligations under the Wilderness Act are quite different. The Wilderness Act defines wilderness as "undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation." 16 U.S.C. § 1131(c). A wilderness area should "generally appear[] to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." Id. Another section of the Act explicitly states that, except as necessary for minimal administrative needs that require occasional vehicle use, "there shall be . . . no structure or installation within any such [wilderness] area." 16 U.S.C. § 1133(c). As the Park Service notes, Section 1133(b) mentions "historical use" along with "recreational, scenic, scientific, educational, [and] conservation" uses. However, this list tracks the definition of wilderness areas in § 1131(c), which describes "a primitive and unconfined type of recreation" and "ecological, geological, or other features of scientific, educational, scenic, or historical value." 16 U.S.C. § 1131(c). Given the consistent evocation of "untrammeled" and "natural" areas, the previous pairing of "historical" with

_____

[8]See http://www.nationalregisterofhistoricplaces.com/GA/Camden/districts.html (accessed June 25, 2004).

11

"ecological" and "geological" features, and the explicit prohibition on structures, the only reasonable reading of "historical use" in the Wilderness Act refers to natural, rather than man-made, features.

Of course, Congress may separately provide for the preservation of an existing historical structure within a wilderness area, as it has done through the NHPA. Congress wrote the wilderness rules and may create exceptions as it sees fit. Absent these explicit statutory instructions, however, the need to preserve historical structures may not be inferred from the Wilderness Act nor grafted onto its general purpose. Furthermore, any obligation the agency has under the NHPA to preserve these historical structures must be carried out so as to preserve the "wilderness character" of the area. See 16 U.S.C. § 1133(b) ("[E]ach agency administering any area designated as wilderness shall be responsible for preserving the wilderness character of the area and shall so administer such area for such other purposes for which it may have been established as also to preserve its wilderness character.")

This appeal turns not on the preservation of historical structures but on the decision to provide motorized public access to them across designated wilderness areas. The Wilderness Act bars the use of motor vehicles in these areas "except as necessary to meet minimum requirements for the administration of the area for the

12

purpose of this chapter [the Wilderness Act]." 16 U.S.C. § 1133(c). The Park Service's decision to "administer" the Settlement using a fifteen-passenger van filled with tourists simply cannot be construed as "necessary" to meet the "minimum requirements" for administering the area "for the purpose of [the Wilderness Act]." 16 U.S.C. § 1133(c). The plain language of the statute contradicts the Park Service position. When interpreting the language of a statute, "we generally give the words used their ordinary meaning." Griffith v. United States, 206 F.3d 1389, 1393 (11th Cir. 2000) (en banc) (citations and internal quotation marks omitted). If these words are unambiguous, our inquiry is complete, for "we must presume that Congress said what it meant and meant what it said." CBS, Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001) (citation omitted). In no ordinary sense of the word can the transportation of fifteen people through wilderness area be "necessary" to administer the area for the purpose of the Wilderness Act.

The Park Service argues that these trips affect the wilderness no more than would a standard Park Service vehicle with no additional passengers. Thus, the agency argues that the "use of motor vehicles" remains the same as what would be minimally necessary for administration. There are several problems with this interpretation. Most obviously, it still runs counter to the plain meaning of the

13

provision. Under an ordinary, common-sense reading,[9] people "use" motor

vehicles when they ride in the Park Service van, thereby increasing the "use of

motor vehicles" beyond the minimum necessary for administration of the

Wilderness Act. The Park Service wishes to define the term based on the number

of vehicles used rather than on the number of people using them, but even so, the

acquisition and use of a large passenger van for transporting tourists cannot

reasonably be squeezed into the phrase "necessary to meet minimum requirements"

of administration. The language in this subsection is quite categorical, providing

for "no motor vehicle use" except "as necessary" and labels this a "prohibition."

16 U.S.C. § 1133(c) (emphasis added). Moreover, the same subsection provides

that there shall be "no other form of mechanical transport" beyond what is

necessary for administration of the Wilderness Act. Id. A passenger van certainly

provides more "transport" than would a Park Service vehicle without extra

passengers.

In addition, the overall purpose and structure of the statute argue against the

agency interpretation. The prohibition on motor vehicle "use" in the Wilderness

Act stems from more than just its potential for physical impact on the environment.

The Act seeks to preserve wilderness areas "in their natural condition" for their

---

[9]Common sense is the most fundamental guide to statutory construction. Tug Allie-B, Inc. v. United States, 273 F.3d 936, 948 (11th Cir. 2001).

14

"use and enjoyment <u>as wilderness</u>." 16 U.S.C. § 1131(a) (emphasis added). The Act promotes the benefits of wilderness "for the American people," especially the "opportunities for a primitive and unconfined type of recreation." <u>Id.</u> at § 1131(c). Thus, the statute seeks to provide the opportunity for a primitive wilderness experience as much as to protect the wilderness lands themselves from physical harm. <u>See also</u> National Park Service, <u>Reference Manual 41</u> at 14 ("In addition to managing these areas for the preservation of the physical wilderness resources, planning for these areas must ensure that the wilderness character is likewise preserved."). Use of a passenger van changes the wilderness experience, not only for the actual passengers, but also for any other persons they happen to pass (more so than would be the case upon meeting a lone park ranger in a jeep). Of course, there is nothing wrong with appreciating natural beauty from inside a passenger van, and many other categories of public land administered by the federal government appropriately offer this opportunity. It simply is not the type of "use and enjoyment" promoted by the Wilderness Act.

Other documents in the record highlight the potential conflict between wilderness values and the transportation of passengers. The agency's Minimum Requirements Determination (MRD) for the Plum Orchard trips recognized "concerns over the van affecting the quality of the visitor experience for those

15

seeking a wilderness experience." R. at 4-46-583. The House report accompanying the bill establishing the Cumberland wilderness area urged the Park Service to provide exclusive access to Plum Orchard by water "in the interests of minimizing unnecessary intrusion on wilderness values." H. Rep. No. 97-383 at 5. The agency itself previously stressed the need to limit mechanized transport to administrative purposes that promote wilderness values. See, e.g., National Park Service, Reference Manual 41 at 16-17 ("Administrative use of motorized equipment or mechanical transport will be authorized only if determined by the superintendent to be the minimum requirement needed by management to achieve the purposes of the area as wilderness, including the preservation of wilderness character and values, or in emergency situations. . . .") (emphasis added).

The language of the specific provision at issue and the overall purpose and structure of the Wilderness Act demonstrate that Congress has unambiguously prohibited the Park Service from offering motorized transportation to park visitors through the wilderness area.

## II. National Environmental Policy Act

Wilderness Watch also argues that, regardless of whether the Wilderness Act permitted these tours, the agency should have evaluated the environmental impact

16

of its proposal through the written review procedures required by NEPA, 42 U.S.C. §§ 4331-35. NEPA essentially forces federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989). NEPA imposes procedural requirements rather than substantive results, and so long as an agency has taken a "hard look" at the environmental consequences, a reviewing court may not impose its preferred outcome on the agency. Fund for Animals, Inc. v. Rice, 85 F.3d 535, 546 (11th Cir. 1996).

Both parties agree that the Park Service did not document any formal NEPA review before its decision. The Park Service argues that its action qualified for a categorical exclusion from NEPA review, thus relieving the agency from the need to conduct any formal, written review. The Park Service directs our attention to regulations issued by the Council on Environmental Quality permitting each agency to identify categories of actions that "do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation

17

of these regulations . . . and for which, therefore, neither an environmental assessment nor environmental impact statement is required." 40 C.F.R. § 1508.4. In its list of such categorical exclusions, the Department of the Interior has identified some eleven routine activities that do not require NEPA analysis. Dep't of the Interior, Department Manual, part 516, ch.2, app. 1, 49 Fed. Reg. 21437 (May 21, 1984). In this case, the Park Service relies on the exclusion for "[r]outine and continuing government business, including such things as supervision, administration, operations, maintenance and replacement activities having limited context and intensity; e.g. limited size and magnitude or short-term effects." Id. at 21439 ¶ 1.8.

Wilderness Watch argues that the Park Service cannot invoke a categorical exclusion because there is no evidence that the agency determined that the exclusion applied at the time it agreed to transport visitors. In effect, Wilderness Watch accuses the agency of failing to consider the environmental impacts of its decision and then resorting to the exclusion as a post hoc rationalization. If true, "[t]his would frustrate the fundamental purpose of NEPA, which is to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." California v. Norton, 311 F.3d 1162, 1175 (9th Cir. 2002) (discussing a similar allegation).

After reviewing the record, we cannot find any indication that the Park Service considered the application of the categorical exclusion prior to its decision, nor does the agency direct our attention to any such evidence. Rather, the Park Service argues that forcing an agency to formally document reliance on a categorical exclusion would defeat the purpose of the exclusion: to streamline procedures and reduce paperwork and delay. Appellee Br. at 44-45 (citing 40 C.F.R. §§ 1400.4(p) & 1500.5(k)). We disagree. Documentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did. As the Ninth Circuit recently pointed out,

> it is difficult for a reviewing court to determine if the application of an exclusion is arbitrary and capricious where there is no contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision. Post hoc invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made.

California, 311 F.3d at 1176. In most instances, a short statement that a categorical exclusion has been invoked will suffice to assure a reviewing court that environmental effects have been considered.[10]

---

[10]As the District of Colombia district court remarked upon reaching a similar conclusion:

19

Moreover, in this case, we do not believe that the agency action falls within the categorical exclusion for "routine and continuing government business." Obtaining a large van to accommodate fifteen tourists hardly appears to be a "routine and continuing" form of administration and maintenance. Even assuming this exclusion applied, Interior Department regulations create exceptions to every categorical exclusion, several of which may be relevant here. Department Manual, 49 Fed. Reg. at 21439 App. 2. The regulations state that "environmental documents must be prepared for actions which may . . . (2.2) Have adverse effects on . . . wilderness areas . . . (2.5) Establish a precedent for future action . . . (2.10) Threaten to violate a federal . . . law or requirement imposed for the protection of the environment." Id. at ¶¶ 2.2, 2.5, & 2.10 (emphasis added). Even crediting the agency's position that the van trips would have "no net increase in impact" on the wilderness area,[11] mechanized passenger service through a wilderness area creates

---

The Court does not intend to establish a requirement that an agency prepare a full-blown statement of reasons for invoking a categorical exclusion ["CE"]. Such a requirement would detract from the legitimate governmental interest in avoiding unnecessary paperwork for actions that legitimately fall under a categorical exclusion and do not require an [Environmental Assessment] or [Environmental Impact Statement]. The Court simply holds that a post hoc assertion of a CE during litigation, unsupported by any evidence in the administrative record or elsewhere that such a determination was made at the appropriate time, cannot justify a failure to prepare either an EA or an EIS.

Edmonds Inst. v. Babbitt, 42 F. Supp. 2d 1, 18 n.11 (D.D.C. 1999).

[11]We note that, unlike the MRD for the Plum Orchard trips, the MRD for the Settlement trips does not mention "concerns over the van affecting the quality of the visitor experience for

a potential "precedent for future action" and, as described above, the policy "threaten[s] to violate" the Wilderness Act. At a minimum, the agency should have recognized that these exceptions "may" apply. Courts of Appeals have, on occasion, reversed agency invocations of categorical exclusions that failed to consider the relevant Interior Department exceptions. See, e.g., California, 311 F.3d at 1176 (discussing the exceptions for adverse effects on threatened species, ecologically significant areas, and highly controversial environmental effects); Fund for Animals v. Babbitt, 89 F.3d 128, 133 (2d Cir. 1996) (reversing a finding of categorical exclusion because the program did not fit comfortably into any of the Interior Department categories and because the scheduled moose hunt would trigger the exception for activities that have "highly controversial environmental effects.").

The district court agreed that the agency had not made a proper determination that a categorical exclusion applied before making its decision. However, the court found that remanding for further NEPA review would be pointless given the agency's later statement in the Settlement MRD that there were no adverse environmental impacts. In our view, the inclusion of two conclusory sentences in the MRD several months after the tours had started does not represent

those seeking a wilderness experience." R. at 4-46-583. The record does not demonstrate that the Park Service ever considered this particular impact of the Settlement trips.

the sort of "technical violation" of NEPA that could excuse non-compliance.

NEPA imposes procedural requirements <u>before</u> decisions are made in order to

ensure that those decisions take environmental consequences into account.

Permitting an agency to avoid a NEPA violation through a subsequent, conclusory

statement that it would not have reached a different result even with the proper

analysis would significantly undermine the statutory scheme. Other circuits have

only been willing to declare a NEPA violation harmless when the relevant decision

makers actually engaged in significant environmental analysis prior to the decision

but failed to comply with the exact procedures mandated. <u>See, e.g.</u>, <u>Save Our</u>

<u>Heritage, Inc. v. FAA</u>, 269 F.3d 49, 59-62 (1st Cir. 2001); <u>Sierra Club v. Slater</u>,

120 F.3d 623, 637 (6th Cir. 1997); <u>Laguna Greenbelt, Inc. v. United States Dep't of</u>

<u>Transp.</u>, 42 F.3d 517, 527 (9th Cir. 1994); <u>Ill. Commerce Comm'n v. ICC</u>, 848

F.2d 1246, 1257 (D.C. Cir. 1988). That is not the case here. In the absence of

evidence that an agency seriously considered environmental impacts prior to

making its decision, violations of NEPA cannot be considered harmless.[12]

### III. Conclusion

---

[12]Because we hold that the Park Service's decision to transport tourists through wilderness areas was made in violation of NEPA, we do not reach the question of whether the decision-making process also violated the procedural requirements of the Federal Advisory Committee Act, 5 U.S.C. App. 2.

We recognize the difficult position of the Park Service in this case.  Faced with competing demands from different constituencies in both Congress and the general public, the agency attempted to find a compromise that would satisfy all interested parties and potentially stave off legislative changes to the status of the Cumberland Island wilderness area.  Although this goal is laudable, the statute limits motor vehicle use and transport to what is "necessary to meet minimum requirements for the administration of the area."  The compromise on public transportation reached in this case cannot be squared with the language of the Wilderness Act.

**REVERSED.**